UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:20-cr-00271-RFB-VCF |
| Plaintiff, | ORDER |
| v. | |
| TERRANCE BROWN, | |
| Defendant. | |

### I. INTRODUCTION

Before the Court is Mr. Terrance Brown's Motion to Suppress. ECF No. 17. On May 27, 2021 and June 1, 2021 this Court held an evidentiary hearing on the Motion to Suppress. The Court held an evidentiary hearing on this Motion on February 25, 2021. ECF No. 34. For the reasons stated below, the Court grants the Motion to Suppress.

### II. FACTUAL FINDINGS

The Court makes the following factual findings based upon consideration of the evidence submitted at the evidentiary hearing in this case.

On March 11, 2020, at approximately 7:45 p.m., Las Vegas Metropolitan Police ("Metro") Officers Espadas and Larson saw a white Hyundai Santa Fe parked in front of Sunny's Chicken and Fish restaurant in a mall in Las Vegas. This mall was in a predominantly minority neighborhood. On this night, the mall was busy with many patrons. The officers had not received any specific information that criminal activity was afoot in the mall. They had not received any information about recent drug activity in the mall or any specific information about a particular drug sale or dealer in the mall. The Court does not find that the officers or the government

established by credible evidence that the mall itself or the neighborhood was a high-crime area, or an area known for drug-related activity or other criminal activity.

When the officers first drove by the mall, they observed an unknown African-American individual standing next to the driver's side door of the white Hyundai in the parking lot. The officers then drove into the parking lot of the mall. As they pulled into the parking lot, they observed the individual who had been next to the Hyundai get into a SUV and drive away. The Court does not find that the officers actually observed a hand-to-hand exchange between this individual and the driver of the Hyundai, an African-American man later identified as Terence Brown, the Defendant. The officers did not follow the SUV. There is no video footage of any alleged hand-to-hand exchange. After the SUV drove away, the officers saw Brown go into a liquor store. After Brown came out of the liquor store and got back into the Hyundai, the officers decided to detain him. They pulled their patrol car behind the Hyundai preventing the Hyundai from being able to leave the parking lot. They activated their patrol lights.

After blocking the Hyundai in the parking lot, the officers exited their vehicle. Espadas approached the driver's side of the vehicle. Larson approached on the passenger side of the car. He looked into the front of the car using his flashlight and did not observe anything illegal. Espadas, upon reaching the driver's side of the car, where the window was down, immediately recognized the driver as Terence Brown, whom he had arrested for having a concealed weapon on January 20, 2020. Espadas then opened the driver door and ordered Brown to exit the vehicle. At the time that Espadas ordered Brown out of the vehicle, he could see into the Hyundai and did not see any contraband or a weapon. When Brown exited the vehicle, Espadas asked Brown if Brown remembered their previous encounter in which Brown had allegedly threatened to hurt or harm Espadas. Espadas told Brown: "I remember you had a gun last time and you said you were gonna hurt me the next time you saw me." Brown denied that he had threatened Espadas.

The Court received evidence on this prior incident as well. The Court finds that Brown did not threaten to hurt or harm Espadas at any time during this prior incident. This incident occurred during the Martin Luther King Day parade which Brown was attending with his family. Espadas observed Brown at the parade with his family. During this incident, Espadas did not observe Brown

engage in any threatening conduct. Indeed, Espadas admitted that he had information that Brown, and his family were in fact going to be targets of violence. Espadas conceded that he used an alleged jaywalking violation as a basis to detain and search Brown when Brown declined to speak with Espadas. Espadas also admitted that had this occurred in the predominantly affluent and non-minority Summerlin area of Las Vegas he would not have even sought to detain Brown. During the January 20, 2020 incident, substantial and disproportionate force was used by several officers against Brown in front of his wife and adolescent children. Officers found a weapon on Brown when he was detained. He was then arrested. While being transported to the detention facility, Brown told Espadas that he wished that someday Espadas would suffer the horrible "luck" that Brown had suffered on this day. Brown never threatened to harm Espadas during this transportation and interaction.

At the initiation of the stop in this case, Espadas incorrectly and wrongly accused Brown of previously threatening to harm Espadas. The Court finds that Espadas had at best a biased recollection of what had transpired at the January 20 encounter. Espadas' previous negative interaction with Brown was the driving and motivating force for his interactions with Brown on the March stop. Immediately upon recognizing Brown, Espadas took an aggressive, hostile, and belligerent demeanor with Brown. He ordered Brown out of the vehicle and opened the door to the driver's side door before Brown could even open it.  When Brown exited the vehicle, Espadas stood within a foot of Brown almost face-to-face in an intentionally threatening and confrontational manner. This approach was opposite to an approach that would have been based upon ensuring officer safety. Espadas clearly did have any concern for his safety. Rather, it was clear that Espadas took this approach in an effort to intimidate and menace Brown. Espadas' body was tense, and he appeared as if he would physically attack Brown or was challenging Brown to physically confront him. Brown, however, who appeared to sense Espadas' hostility, was calm and nonconfrontational. He made no threatening or suspicious movements that would have created an issue of officer safety. Indeed, he had had his hands in the air in a defensive and submissive posture. Espadas appeared unaffected by Brown's attempts to mollify his hostility. The Court finds Espadas treated Brown in this physically intimidating manner based upon his biased perspective

of their prior encounter. The Court does not find that there were any objective facts during this encounter which would suggest that Brown was a threat to officer safety.

After a few minutes, Espadas ordered Brown to walk toward the patrol car blocking in his Hyundai and approach Larson. Larson ordered Brown to keep his hands away from his pockets and Brown put his hands in the air. Larson then immediately placed Brown in handcuffs. When patting down Brown after placing him in handcuffs, Larson did not feel any bulge like that of a weapon. Larson then placed Brown in front of the patrol car facing away from the Hyundai. Larson told Brown that he was not under arrest. However, Larson did tell Brown that the handcuffs would come off only after the police had completed their "investigation" of Brown. At the time that Brown was handcuffed, he was not Mirandized. Brown then told Larson that he thought that Espadas had an issue with him. Larson then said that Brown should just deal with or talk to Larson. Brown was not free to leave at this moment and the officers would not have let him leave if he asked. Larson then asked Brown if he could search Brown and the vehicle. Brown said that Larson could search the vehicle. Brown also said that the vehicle contained "weed" and that his wife had recently purchased a gun. Officers then proceed to search the vehicle. They found marijuana in the vehicle. The officers then sought a telephonic warrant to open any locked containers in the vehicle to search for additional evidence of drugs. Inside of the locked glove compartment, officers located a handgun.

### III.    LEGAL STANDARD

The Fourth Amendment protects the right of the people to be secure in their persons against unreasonable searches and seizures by the government. U.S. Const. amend. IV. A warrantless search is *per se* unreasonable under the Fourth Amendment, subject to only a "few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967).

An officer may briefly stop and detain an individual or car if the officer has reasonable suspicion to believe criminal activity is afoot. United States v. Arvizu, 534 U.S. 266 (2002); Terry v. Ohio, 392 U.S. 1 (1968). Courts must look at the "totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal

wrongdoing." Arvizu, 534 U.S. at 273 (internal citations omitted). An officer's subjective motives for a stop are irrelevant; the only inquiry is whether objectively there were enough facts to support reasonable suspicion of criminal activity. Whren v. United States, 517 U.S. 806 (1996).

"Whether an arrest has occurred depends on all the surrounding circumstances, including the extent to which liberty of movement is curtailed and the type of force or authority employed." United States v. Robertson, 833 F.2d 777, 780 (9th Cir. 1987). "A Terry stop involves no more than a brief stop, interrogation and, under the proper circumstances, a brief check for weapons. Beyond such a brief narrowly circumscribed intrusion, an arrest occurs, for which probable cause is required." Id. "The proper focus when determining coerciveness or restraint sufficient to constitute an arrest or detention is not the subjective belief of the agents. Rather [courts] review the situation from the perspective of the person seized." United States v. Delgadillo-Velasquez, 856 F.3d 1292, 1295 (9th Cir. 1988). "The ultimate question is whether, in view of all the circumstances, a reasonable person would believe himself to be under arrest." Robertson, 833 F.2d at 780. A person is under arrest if "a reasonable, innocent person in these circumstances would not have felt free to leave after brief questioning." Delgadillo-Velasquez, 856 F.2d at 1295-96.

"It is well established that a person's presence or 'mere propinquity to … criminal activity does not, without more, give rise to probable cause.'" United States v. Lopez, 482 F.3d 1067, 1074 (9th Cir. 2007) (quoting Ybarra v. Illinois, 444 U.S. 85, 91 (1979)); see also United States v. Collins, 427 F.3d 688, 691 (9th Cir. 2005). Moreover, "ambiguous conduct of a person found in the proximity of the scene of a crime does not establish probable cause." United States v. Pinion, 800 F.2d 976, 980 (9th Cir. 1986); see also Delgadillo-Velasquez, 856 F.2d at 1296 ("[T]he officers are left with known facts that describe a generalized meeting which is just as consistent with appellant's innocence as with suspicious conduct. Without more, the actions observed by marshals do not constitute 'particularized evidence of suspicious criminal activity.'").

/ / /

/ / /

## IV. DISCUSSION

The Court finds that the police a.) did not have reasonable suspicion to detain Brown and b.) unlawfully subjected Brown to a de facto arrest without probable cause—both of which led to an unlawful search of his vehicle.

### A. No Reasonable Suspicion to Detain Brown

The Court finds that the officers did not have reasonable suspicion to detain Brown. The Court first finds Brown was detained in the form of a Terry stop when the officers pulled their car in behind his car, blocking him from leaving. Espadas then approached the driver's side door of the Hyundai and ordered Brown out of the vehicle. The Court finds that at the moment that Brown was ordered out of the vehicle, the officers did not have reasonable suspicion to detain him. The officers had not seen Brown engage in criminal activity and did not have any articulable or specific facts supporting an objective finding that criminal activity was afoot. The Court finds that they did not actually see a hand-to-hand drug transaction. They did not even see an exchange between Brown and the individual leaning outside of his window. No such exchange is captured on video. The Court finds that the only facts established by credible evidence or testimony at the hearing is that the officers saw a man standing outside of the vehicle's door and leaning toward the door. By the time the officers make a closer pass through the parking lot, the individual outside of the door had gotten into another car and started to drive off. The officers did not see Brown do anything suspicious while in the vehicle nor did they see this other individual do anything suspicious. There is not credible evidence that the area was a high crime area. The Court finds that the officers simply had a "hunch" that something illegal had transpired. The detention of Brown by officers when he was ordered out of the car was therefore unlawful.

### B. Brown Was Subject To De Facto Arrest Without Probable Cause

The Court further finds that Brown was subject to an de facto arrest by the officers that was not supported by probable cause.

The Court finds that prior to Brown being asked about searching his car or speaking about the contents of car he had been subject to a de facto arrest. In the minutes prior to being asked about his vehicle, the totality of the circumstances indicated that Brown was in custody and not free to leave. He had been ordered out of his car without reasonable suspicion. He had been ordered to walk to the front of the patrol vehicle. He had been placed in handcuffs immediately upon being ordered to walk to the front of the patrol car. He was then positioned facing away from his vehicle and facing the patrol car. He was told that he was not "under arrest." However, he was told that he would not be let out of the handcuffs *until* the police had finished their investigation. He had been ordered into custody by Espadas, who had wrongly accused him of threats. He was not free to leave. The Court finds based upon the totality of circumstances Brown was subject to a de facto arrest. Robertson, 833 F.2d at 780.

This de facto arrest occurred without probable cause. As noted previously, the police did not actually see criminal activity or observe sufficient facts to conclude that criminal activity was afoot. No new additional facts supporting probable cause were learned by the police between the moment when Brown was initially detained by the police and when he was under de facto arrest in handcuffs at the front of the patrol car. The Court does find that the one fact that was new from the initial detention was Espadas' recognition of Brown as an individual whom he had previously arrested for having a weapon. Importantly, however, the Court finds that Brown had been patted down for weapons while being handcuffed. No weapons (or bulges of weapons) were observed on Brown or in plain sight in his vehicle after he was handcuffed and before he was questioned about the contents of his car. He was informed by the officers that he would not be released until they had completed their investigation. He was told this even after they had already determined that he had no weapons on him and no weapons were observed in the car. He was therefore no threat to officer safety. As there was no issue of safety and no articulable facts to support a further investigation or stop, the officers had no basis to continue his detention and hold him until their "investigation" was completed. The Court thus finds that at the time that Brown was under arrest in the moment prior to be asked about the contents of his car he was subject to a de facto arrest without probable cause. This arrest was therefore unlawful.

Finally, the Court finds that all of the physical and testimonial evidence obtained as a result of Brown's unlawful extended detention, including any statements or physical evidence, must be suppressed as fruit of an unlawful search and seizure. See Wong Sun v. United States, 371 U.S. 471, 484-85 (1963).

V.   CONCLUSION

**IT IS HEREBY ORDERED** that the Motion to Suppress [ECF No. 17] is GRANTED.

**DATE:** April 5, 2022.

_____
**RICHARD F. BOULWARE, II
UNITED STATES DISTRICT JUDGE**